UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
THOMAS C. WALLACE,

              Plaintiff,

     - against -

SUFFOLK COUNTY POLICE DEPARTMENT,
COUNTY OF SUFFOLK, JOHN GALLAGHER,
PHILLIP ROBILOTTO, and JAMES ABBOTT,
Individually and in their Official Capacities,

              Defendants.
--------------------------------------------------------------X

**MEMORANDUM & ORDER**
04-CV-2599 (RRM)(WDW)

**MAUSKOPF, United States District Judge.**

       The parties are presumed to be familiar with the facts of this case, which are recounted in

two previous decisions of this Court. *See Wallace v. Suffolk County Police Dep't*, No. 04-CV-

2599 (E.D.N.Y. Feb. 15, 2005) (Seybert, J.) ("Wallace I"); *Wallace v. Suffolk County Police*

*Dep't*, No. 04-CV-2599 (E.D.N.Y. Feb. 5, 2007) (Seybert, J.) ("Wallace II"). *Wallace I* dismissed

Plaintiff's Fourteenth Amendment equal protection claim, while *Wallace II* denied Defendants'

motion for summary judgment on Plaintiff's remaining First Amendment retaliation claim.

Between July 20, 2009 and July 23, 2009 a jury trial was held on that claim, with the jury finding

that Defendants John Gallagher, Phillip Robilotto, and James Abbott[1] (collectively, the

"Individual Defendants") had taken several distinct acts of retaliation against Plaintiff in

response to his exercise of his First Amendment free speech rights, but finding that the County of

Suffolk (the "County") was not subject to liability under *Monell v. City of New York Dep't of*

*Social Servs.*, 436 U.S. 658 (1978). The jury awarded compensatory damages of $200,000 for

emotional distress, as well as punitive damages of $225,000 against each Individual Defendant,

---

[1] Defendant Gallagher was the Commissioner of the Suffolk County Police Department during the time at issue,
Abbott the Deputy Commissioner, and Robilotto the Chief of Department.

for a total damages award of $875,000. For each Defendant, the jury was instructed to consider seven potential adverse employment actions taken in retaliation for Plaintiff's protected speech, as well as the option to find that, even if none of the alleged actions were serious enough by themselves to constitute an adverse employment action, all of the actions proven, taken together, constituted an actionable pattern of harassment. The jury found that each Individual Defendant took at least one retaliatory adverse employment action, and each potential action was found against at least one Defendant, as well as a pattern of harassment as against Defendant Abbott only.

Defendants now seek judgment as a matter of law on Plaintiff's First Amendment retaliation claim pursuant to Federal Rule of Civil Procedure 50(b), or, in the alternative, a new trial limited to damages, or remittitur of the compensatory and punitive damages awards pursuant to Federal Rule of Civil Procedure 59(a). For the reasons set forth below, Defendants are denied judgment as a matter of law on Plaintiff's First Amendment retaliation claim. However, because the punitive damages award is excessive, a new trial on damages will be ordered unless Plaintiff accepts a remittitur of the punitive damages awards to $100,000 per Individual Defendant.

## DISCUSSION

### I.    Standard of Review

A motion for judgment as a matter of law pursuant to Rule 50(b) is appropriately granted when the court determines that "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Ruhling v. Newsday, Inc.*, No. 04-CV-2430, 2008 U.S. Dist. LEXIS

38936, at *9 (E.D.N.Y. May 13, 2008) (citing *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 120 (2d Cir. 1998)). Accordingly, "[a] movant seeking to set aside a jury verdict faces a 'high bar.'" *Id.* at *10 (quoting *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 479 (2d Cir. 2001)). A jury verdict should be set aside under Rule 50 only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or" where there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [it]." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 79 (2d Cir. 2006). "When applying this standard, a court is required to view the evidence in the light most favorable to the non-moving party and must refrain from 'assess[ing] the weight of conflicting evidence, pass[ing] on the credibility of the witnesses, or substitut[ing] its judgment for that of the jury.'" *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 39 (E.D.N.Y. 2009) (quoting *Leblanc-Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir. 1995)) (alterations in original).

The standard for granting a new trial pursuant to Federal Rule of Civil Procedure 59 is less stringent than that for judgment as a matter of law. *See Manley v. Ambase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003). Under Rule 59, "'a new trial motion may be granted even if there is substantial evidence to support the verdict.'" *DeWitt v. N.Y. State Housing Fin. Agency*, No. 97 Civ. 4651, 1999 U.S. Dist. LEXIS 13057, at *3 n.1 (S.D.N.Y. Aug. 24, 1999) (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 683 (2d Cir. 1978)). In addition, the court is not required to view the evidence in the light most favorable to the non-moving party, but may weigh it independently.

*See Ruhling*, 2008 U.S. Dist. LEXIS 38936, at *11 (citing *Manley*, 337 F.3d at 244–45).

Nevertheless, the court should only grant a motion for a new trial where "[it] is convinced that

the jury reached a seriously erroneous result, or that the verdict is against the weight of the

evidence," *Manley*, 337 F.3d at 244–45, or "'the trial was not fair to the moving party,'" *DeWitt*,

199 U.S. Dist. LEXIS 13057, at *3 (quoting *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d

Cir. 1983)). "In evaluating a Rule 59 motion, the trial judge's duty 'is essentially to see that

there is no miscarriage of justice.'" *Id.* (quoting *Sharkey v. Lasmo (AUL Ltd.)*, 55 F. Supp. 2d

279, 283 (S.D.N.Y. 1999)).

Finally, if the court finds the verdict to be correct, but that the damages awarded by the

jury are excessive, it may order a new trial, a new trial limited to damages, or, pursuant to the

practice of remittitur, condition the denial of a motion for a new trial on the plaintiff's acceptance

of a reduced damages award. *See Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 258 (2d Cir.

2005). The court may not, however, simply reduce the damages without affording the prevailing

party the option of a new trial. *See Ruhling*, 2008 U.S. Dist. LEXIS 38936, at *11.

## II. First Amendment Retaliation

Defendants do not question the jury instructions in this case, nor do they challenge the list

of potential adverse employment actions submitted to the jury; instead, they focus their attack on

the sufficiency of the evidence underlying the jury's verdict. However, a brief overview of the

elements of First Amendment retaliation is helpful to the discussion that follows.

4

Here, the Court instructed the jury that the Plaintiff had to prove three elements in order to prevail on his claim of First Amendment retaliation:

> *First,* that Plaintiff engaged in speech protected by the First Amendment;
>
> *Second*, that each of the Defendants while acting under color of state law, subjected Plaintiff to an adverse employment action; and
>
> *Third*, that the Defendants' decision to take the adverse employment action was motivated or substantially caused by Plaintiff's exercise of free speech.

(Jury Charge, Trial Tr. 601.) Prior to submission of the case to the jury, the Court ruled as a matter of law that (1) if the jury found that Plaintiff in fact uttered the speech he claimed, that speech was protected by the First Amendment, and (2) Defendants' actions, if found to have been taken by the jury, were taken while acting under color of state law. The Court submitted for the jury's consideration eight potential adverse employment actions.[2] Regarding those potential actions, the Court instructed the jury that, "For specific acts to constitute an adverse employment action, you must find by a preponderance of the evidence that the act was of such a nature that a

---

[2] The eight potential adverse employment actions submitted to the jury were:

> (1) in November 2002, Defendants prematurely submitted Plaintiff's retirement papers; (2) . . . Defendants omitted and/or failed to correct certain of Plaintiff's March 11, 1998 injuries from those retirement papers; (3) on September 2, 2003, the Defendants determined that Plaintiff was fit for light duty based on a cursory medical examination; (4) Defendants assigned Plaintiff to the First Precinct; (5) Defendants failed to correct Plaintiff's Injured Employee Report, despite his complaints of inaccuracy; (6) Defendants failed to investigate Plaintiff's complaints regarding training, equipment, staffing, supervision, morale, and other deficiencies in the Emergency Services Unit; (7) Defendants engaged in a pattern of harassment of Plaintiff; and (8) Defendants failed to prevent, stop, or redress the violation of Plaintiff's First Amendment rights.

(Trial Tr. at 603–04; *see also* Jury Verdict Sheet (Doc. No. 64).)

similarly situated individual of ordinary firmness might well have been deterred from exercising his First Amendment rights." (*Id.* at 605.) The Court cautioned the jury, however, that:

> Adverse employment actions may include acts or events that, by themselves, seem minor or inconsequential. However, not every unpleasant matter constitutes an adverse employment action. A plaintiff must show that an alleged act of retaliation is more than *de minim[i]s*. In general, whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination. Thus, you may consider any and all relevant background information or surrounding circumstances to determine whether an action may have dissuaded a similarly situated individual of ordinary firmness from engaging in the protected speech at issue here.

(*Id.* at 606.) Moreover, the jury was also instructed that:

> In addition, an accumulation of actions may, when taken together, amount to a pattern of harassment that may constitute an adverse employment action. In order for you to find such harassment, Plaintiff must prove by a preponderance of the evidence that the combination of actions by a defendant created a working environment that, objectively, was unreasonably inferior and adverse compared to what would be considered normal or typical, not model or ideal, for that position. A position may become unreasonably inferior if there are repeated and severe incidents of harassment that, taken as a whole, would deter a similarly situated individual of ordinary firmness from exercising his First Amendment rights. Thus an accumulation of actions may combine to reach critical mass, and thereby establish a pattern of harassment sufficient to constitute an adverse employment action.

(*Id.* at 606–07.)

In addition to proving that he was subjected to at least one adverse employment action, Plaintiff also needed to prove that his protected speech played "a substantial or motivating role" in the decision to take that action against the Plaintiff. (*Id.* at 607.) Furthermore, in order to find an Individual Defendant liable with respect to any given action, the jury had to consider whether that defendant was "personally involved in the deprivation of Plaintiff's rights." (*Id.* at 608.)

The Individual Defendants in this case, the three highest-ranking officials in the Suffolk County Police Department, could be liable either because they directly participated in the deprivation of Plaintiff's rights, or on the basis of supervisory liability. The jury was instructed that an Individual Defendant who is a supervisory official could be held liable, even if the supervisor did not directly participate in the violation of Plaintiff's rights, in the following situations:

1. the supervisor, after learning that the Plaintiff was deprived of a constitutional right, failed to take reasonable steps to remedy the wrong; or

2. the supervisor created a policy or custom under which unconstitutional practices occurred, or allowed this policy or custom to continue, with knowledge that it was happening; or

3. the supervisor was deliberately indifferent in supervising subordinates who directly engaged in the unconstitutional conduct; or

4. the supervisor was deliberately indifferent to a known pattern of constitutional abuses.

(*Id.* at 608–09.) The jury was cautioned, however, that:

A supervisory official may not—and I stress may not—be held liable, based solely on the fact that the supervisor had the obligation, had the ability and authority to supervise the subordinate employee. Therefore, the mere existence of the supervisory relationship is not by itself a sufficient basis for imposing liability upon the supervisory official.

(*Id.* at 609.)

### III. Defendants Are Not Entitled to Judgment as a Matter of Law

Defendants argue that no reasonable jury could have found that each of the Individual Defendants retaliated against the Plaintiff. At trial, Plaintiff testified extensively as to the instances of his protected speech, his attempts to make each of the Individual Defendants aware

of his concerns regarding the training, supervision, equipment, morale, staffing, failure to adhere to rules and regulations, and other deficiencies that affected the performance and safety of the Emergency Services Unit of the Suffolk County Police Department. At the same time that Plaintiff communicated these issues of public concern, he also expressed his frustration with issues relating to his own personal situation, such as his difficulties in correcting his Injured Employee Report and his concerns surrounding any potential return to active duty. As this Court noted during the charging conference, a reasonable jury, based on this testimony, and the testimony of the Individual Defendants, "could find that each of these three defendants through a letter or multiple letters, and/or through conversation or conversations, were aware of Mr. Wallace's complaints, both with respect to his own personal medical situation . . . but also specifically with respect to the matters of public concern that he raised." (Trial Tr. 447.)

A reasonable jury could find that the Individual Defendants not only were aware of Plaintiff's protected speech, but in fact were motivated to retaliate against him because of that speech, based on the threats that Plaintiff testified were made by Abbott and Robilotto. Defendant Abbott admitted making the statement that Plaintiff would "do something now and lament it for a lifetime." (Trial Tr. 245–46.) While Defendants argue that Abbott did not intend for this statement to be taken as a threat, the jury was of course free to disregard that interpretation of the phrase and to instead find that it was intended to chill Plaintiff's exercise of his free speech rights. Moreover, the jury could also have credited Plaintiff's testimony as to threats by Robilotto. While there was no evidence as to specific threats made by Gallagher, there

was extensive evidence as to the close working relationship between the three Individual Defendants, and the jury could reasonably have found that the decisions to take at least some of the adverse employment actions were either made collectively, or at least with shared knowledge of Plaintiff's speech and the desire to suppress such speech.

Alternatively, the jury could have found causation based simply on the temporal proximity between Plaintiff's complaints and the adverse actions taken against him. Finally, as argued by Plaintiff in his opposition, the jury could have made adverse credibility determinations based on the unexplained inconsistencies between the testimony of Abbott and Robilotto with respect to the investigation of Plaintiff's complaints, or based on a finding that the reasons advanced by Gallagher and Robilotto for the submission of Plaintiff's retirement papers was pretextual and unconvincing. Particularly in a case such as this, where the alleged retaliation occurred at the highest levels of the Suffolk County Police Department, the credibility determinations made by the jury after observing the Plaintiff and the three Individual Defendants testify are entitled to deference so long as they are not completely unsupported by the evidence or so against the overwhelming amount of evidence that a reasonable and fair minded jury could not have found as it did. *See, e.g.*, *Olsen*, 615 F. Supp. 2d at 39.

A. *Defendant James Abbott*

The jury found that Defendant Abbott took five adverse employment actions against the Plaintiff as a result of Plaintiff's protected speech: (1) the premature submission of Plaintiff's retirement papers; (2) the failure to correct Plaintiff's Injured Employee Report; (3) the failure to

9

investigate Plaintiff's complaints regarding training, equipment staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit; (4) the failure to prevent, stop, or redress the violation of Plaintiff's First Amendment rights; and (5) a pattern of harassment. Each of these findings is reasonable. First, while there was no testimony as to Abbott's direct involvement in the submission of Plaintiff's retirement papers, as discussed above, the jury reasonably could have found that he either knew that Robilotto was retaliating against Plaintiff and did nothing to prevent it, or that he took part in the decision to retaliate against Plaintiff as part of a coordinated campaign between the Individual Defendants.

Second, Plaintiff complained to Abbott about the problems with his Injured Employee Report, and testified that Abbott promised to resolve them; in fact, however, Plaintiff was only able to have the report corrected following a lengthy Worker's Compensation process. Defendants now argue that Abbott never had the authority to correct the Injured Employee Report, and so cannot be found liable for having failed to do so, but cite only Abbott's self-serving testimony to support this point. And, in at least one reasonable view of the evidence, Abbott not only asserted that he had the authority to correct the report, but used that purported authority as a bargaining chip in attempting to keep Plaintiff from exercising his First Amendment rights.

The remaining three adverse employment events that Abbott was found to have taken can all be seen as resulting from the nexus of his supervisory authority and his extensive interactions with Plaintiff. Plaintiff testified at trial that he spoke with Abbott on at least three occasions

regarding the training, equipment, staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit, and yet the evidence at trial showed that Abbott never took any action to investigate these matters.[3] In fact, while Abbott testified that he *did* instruct then-Chief Robilotto to investigate the matters of public concern raised by Plaintiff, and that Robilotto had reported back that Plaintiff's concerns were unfounded, Robilotto not only denied having ever investigated these issues, but also denied ever being asked to do so by Abbott.

Additionally, the jury could reasonably have concluded based on all of the evidence that Abbott had the most involvement both in hearing the concerns of Plaintiff, and in taking steps to make sure that those concerns were never made public. While Gallagher was the Commissioner of the Department, Abbott had the earliest contacts with Plaintiff regarding his concerns, met with Plaintiff on numerous occasions, and admitted to making statements to Plaintiff that the jury could reasonably have found as evincing an intent to deter Plaintiff's exercise of his First Amendment rights. Accordingly, the jury could reasonably conclude that Abbott was the highest-ranking official intimately involved in most of the actions taken against Plaintiff, and the

---

[3] Defendants also argue that this action was not adverse, because it did not "deprive [Plaintiff] of any benefit or that he experienced any other tangible negative employment action as a result of [Defendants'] alleged failure to investigate these issues." (Defs.' Mem. (Doc. No. 77) at 8.) Defendants apparently persist in the mistaken belief, asserted at trial, that an adverse employment action in the First Amendment context must result in a change in the terms and conditions of Plaintiff's employment. (*See* Trial Tr. 476.) However, as this Court noted then, and instructed the jury, the correct standard in the First Amendment retaliation context is whether the alleged adverse action would deter the exercise of free speech rights by a similarly situated individual of ordinary firmness. (*Id.* at 477–78 (citing *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225–26 (2d Cir. 2006)).) Under the *Zelnik* standard, the jury reasonably could have found that the decision not to investigate Plaintiff's concerns regarding the important public interest in the safety and training of the Emergency Services Unit was intended to deter Plaintiff's exercise of his free speech rights, and that it would have had the same effect on a similarly situated individual of ordinary firmness.

11

jury's finding that he retaliated against Plaintiff by failing to prevent, stop, or redress the violation of Plaintiff's First Amendment rights and engaged in a pattern of harassment against Plaintiff is reasonable and will not be overturned.

  *B. Defendant John Gallagher*

  The jury found that Defendant Gallagher subjected Plaintiff to four separate adverse employment actions: (1) the premature submission of Plaintiff's retirement papers; (2) the omission of and/or failure to correct certain information in the retirement papers; (3) the failure to correct Plaintiff's Injured Employee Report; and (4) the failure to investigate Plaintiff's complaints regarding training, equipment, staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit. With regards to the premature submission of Plaintiff's retirement papers, it is undisputed that Gallagher, as Commissioner, signed the application for involuntary retirement submitted by the Department on Plaintiff's behalf. Furthermore, while Defendants argue that the decision to submit the application was not caused by Plaintiff's protected speech, but was instead the result of the objective application of Departmental rules, the testimony at trial established that Defendants exercised discretion in deciding which officers should be involuntarily retired. There was also evidence that Plaintiff did not even meet the guidelines established by the Department. Based on this, and the discussion above regarding the common knowledge by Defendants regarding Plaintiff's protected speech and other concerns, the jury reasonably could have found that Defendant Gallagher retaliated against Plaintiff by prematurely submitting his retirement papers.

Similarly, the jury's finding that Gallagher retaliated against Plaintiff by omitting or failing to correct certain information in the retirement papers was reasonable, because it is undisputed that the retirement papers did, in fact, incorrectly list Plaintiff's injuries, and that this failure resulted in the ultimate rejection of the County-submitted retirement application by the State. The jury could reasonably have found both that the omission or failure to correct such information was intentional, and done to cause additional difficulties for Plaintiff. The jury could have found that such actions both caused Plaintiff emotional distress and ultimately resulted in actual damages as he was required to use additional sick days until his own (correct) retirement application was approved. Again, the jury could reasonably have found that a person of ordinary firmness would have been deterred from exercising their free speech rights by the threat of such harm, and so this finding will not be overturned.

With regards to the third and fourth adverse employment actions the jury found Gallagher to have taken, they will be upheld for the same reasons as discussed above with respect to Abbott. Both men occupied similar positions of authority in the Police Department, and Gallagher could reasonably be found equally to have known about the issues affecting Plaintiff's Injured Employee Report and his concerns regarding the training, equipment, staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit, yet to have done nothing.

## C. *Defendant Phillip Robilotto*

The jury found that Defendant Robilotto took four adverse employment actions against Plaintiff: (1) the premature submission of Plaintiff's retirement papers; (2) the determination that Plaintiff was fit for light duty; (3) the assignment of Plaintiff to the First Precinct; and (4) the failure to investigate Plaintiff's complaints regarding the training, equipment, staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit. The evidence showed that Robilotto collaborated with Gallagher on the decision to submit Plaintiff's involuntary retirement, and also that he was aware of Plaintiff's protected speech. The jury could also reasonably have found that Robilotto himself threatened Plaintiff in an attempt to deter him from exercising his free speech rights, or that he participated in a decision to retaliate against Plaintiff along with Defendants Abbott and Gallagher. Accordingly, the jury's finding that Robilotto retaliated against Plaintiff by prematurely submitting his retirement papers was reasonable and will not be overturned.

As to the determination that Plaintiff was fit for light duty, and his assignment to the First Precinct, Defendants argue that there was no evidence that Robilotto was involved in these decisions. However, the jury could reasonably have inferred, based on the testimony of threats by Robilotto (including specifically to change Plaintiff's duty status), the fact that the initial Police Surgeon finding of fitness for light duty occurred the same day that Plaintiff delivered

14

another letter detailing his concerns to Commissioner Gallagher,[4] and the fact that there was testimony that the Police Surgeon's examination was cursory and pretextual, that Robilotto had in fact instructed others in the Department to cause Plaintiff to be found fit for light duty in retaliation for his protected speech. Similarly, the assignment of Plaintiff to the First Precinct, which the jury reasonably could have found exposed Plaintiff to prisoner and public contact, which the Medscope evaluation specifically recommended against, could reasonably also be seen as retaliatory, and attributed to Robilotto, who, as Chief of Department, was ultimately responsible for staffing decisions.

Finally, given the testimony that Robilotto was aware of Plaintiff's concerns regarding the training, equipment, staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit, his position with the Department, and the basis on which the jury could reasonably have found retaliatory motive, the jury's finding regarding Robilotto's failure to investigate Plaintiff's concerns will also be upheld.

## IV. Defendants' Rule 59 Challenge to the Damages Award Is Granted in Part

As an alternative to their request for judgment as a matter of law, Defendants ask the Court to either vacate the damages award, and order a new trial limited to damages, or grant remittitur of the jury verdict awarding Plaintiff $200,000 in compensatory damages for emotional distress and $225,000 in punitive damages against each Individual Defendant. "It is well settled

---

[4] There was testimony at trial indicating that Robilotto sometimes read letters addressed to Gallagher. (*See* Trial Tr. 71–72.)

that the calculation of damages is the province of the jury." *Waltz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995) (quoting *Ismail v. Cohen*, 899 F.3d 183, 186 (2d Cir. 1990)). However, "[a] trial judge has discretion under Rule 59 of the Federal Rules of Civil Procedure to overturn verdicts for excessiveness and order a new trial 'without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" *Khan v. HIP Centralized Laboratory Servs.*, No. 04-CV-2411 (DGT), 2008 U.S. Dist. LEXIS 76721, at *17 (E.D.N.Y. Sept. 17, 2008) (quoting *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005)). Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Earl v. Bouchard Transp. Co.*, 917 F2d 1320, 1328 (2d Cir. 1990). The decision as to whether remittitur is required is committed to the discretion of the trial judge. *See Rangolan v. County of Nassau*, 370 F.3d 239, 245 (2d Cir. 2004).

"In reviewing a claim that the jury awarded excessive damages, [the Court] 'view[s] the evidence and draw[s] all factual inferences in favor of the [Plaintiff],' and . . . 'accord[s] substantial deference to the jury's determination of factual issues.'" *Scala v. Moore McCormack Lines*, 985 F.2d 680, 683 (2d Cir. 1993) (citations omitted). A jury's award of damages should not be overturned unless it is "so high as to shock the judicial conscience and constitute a denial of justice." *Ismail*, 899 F.2d at 186. "In determining whether a particular award is excessive, courts have reviewed awards in other cases involving similar injuries, 'bearing in mind that any given judgment depends on a unique set of facts and circumstances.'" *Scala*, 985 F.2d at 684 (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988)). Courts use the

"'least intrusive standard for calculating a remittitur,' namely "remitting the jury's award only to the *maximum* amount that would be upheld by the district court as not excessive." *Martinez v. Port Auth. of N.Y. & N.J.*, 445 F.3d 158, 160 (2d Cir. 2006) (quoting *Earl*, 917 F.2d at 1330).

    A.    *The Jury's Compensatory Damages Award for Emotional Distress Does Not "Shock the Conscience"*

Defendants argue that Plaintiff's claim of emotional distress should be classified as "garden variety," for which, they argue, an award of between $5,000 and $35,000 would be appropriate. (Defs.' Mem. at 17 (citing *Khan*, 2008 U.S. Dist. LEXIS 76721, at *30–32).) Plaintiff responds that the jury's $200,000 award for emotional distress is supported by the evidence and within the range of acceptable awards so as to not shock the judicial conscience. The evidence in support of Plaintiff's claim for emotional distress here consists solely of Plaintiff's own testimony. No medical records or testimony from medical professionals was offered. Plaintiff testified that he experienced sleeplessness, anger, difficulty with his personal and family relationships, stress, tension, and emotional trauma. Plaintiff also testified that he attended a New York City Police Department self-support group, and attended therapy sessions with his daughter.

To support the compensatory damages award, Plaintiff cites to *Meacham v. Knolls Atomic Power Laboratory*, a Second Circuit case that upheld a distinction between emotional distress claims where "a plaintiff's emotional distress consisted of shock, sleepless nights, nightmares, moodiness, humiliation, upset and the like but the plaintiff did not require treatment, " and claims where "either physical sequelae or professional treatment was established." 381 F.3d 56,

77–78 (2d Cir. 2004), *vacated on other grounds sub nom. KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005). In *Rainone v. Potter*, Judge Spatt characterized emotional damages as "garden variety" "'where the evidence of harm was presented primarily through the testimony of the plaintiff, who describe[d] his or her distress in vague or conclusory terms and fail[ed] to describe the severity or consequences of the injury.'" 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005) (quoting Michelle Cucuzza, *Evaluating Emotional Distress Damage Awards to Promote Settlement of Employment Discrimination Claims in the Second Circuit*, 65 Brook. L. Rev. 393, 429 (1999)). Emotional damages are significant, or substantial, however, where "they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony or evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* Recent cases in this district have also applied this framework. *See, e.g., Olsen*, 615 F. Supp. 2d at 46–47; *Khan*, 2008 U.S. Dist. LEXIS 76721, at *29–40; *Ruhling*, 2008 U.S. Dist. LEXIS 38936, at *21–22.

Here, there is ample evidence to support the jury's award of compensatory damages for emotional distress. First, the conduct at issue is highly offensive, given that Plaintiff was subjected to multiple acts giving rise to retaliation over a period of time by the three highest-ranking officials in the Suffolk County Police Department after speaking out on important matters of public concern. These Defendants, at times acting in concert, abused their authority over a vulnerable subordinate. Moreover, the uncontroverted evidence presented by Plaintiff clearly demonstrated the physical sequelae and professional treatment found significant by the

Second Circuit. *Meacham*, 381 F.3d at 77–78.[5] Among other things, the record shows that Plaintiff suffered, virtually daily, from sleepless nights. His hair grayed and fell out. He became tense, agitated, worried about the personal and professional consequences of Defendants' retaliation, and quick-tempered, "flying off the handle" even over minor issues. Plaintiff's relationships with his wife, children and colleagues deteriorated. As the evidence showed, Plaintiff's emotional trauma continued even as of the time of the trial. To help heal from these issues, Plaintiff received various forms of therapy. He attended monthly sessions of the New York City Police Department's self-support group beginning in January 2000. In addition, he and his daughter attended at least fifteen private therapy sessions. Thus, there is ample evidence in the record to support the jury's award.

Defendants argue that Plaintiff's "garden-variety" emotional distress award should be reduced to between $5,000 and $35,000; one court in this district, however, recently rejected that same assertion and found the appropriate range to be higher. *Olsen*, 615 F. Supp. 2d at 46 & n.4 (rejecting $5,000 to $35,000 range in favor of $30,000 to $125,000 range). Similarly, as noted above, the Second Circuit, in *Meacham*, upheld an award of $125,000 for "subjective distress" not accompanied by physical sequelae or professional treatment, and noted that the passage of time since that award (made in 2002) would support higher awards in future cases. 381 F.3d at 77–78; *see also* U.S. Dep't of Labor, U.S. Bureau of Labor Statistics, CPI Inflation Calculator,

---

[5] *Meacham* involved New York state law claims, in which the "deviates materially" standard applies; this case involves a federal claim, in which the more deferential "shocks the judicial conscience" standard applies, see *Gasperini v. Center for Humanities, Inc.*, 149 F.3d 137, 139 (2d Cir. 1998).

http://data.bls.gov/cgi-bin/cpicalc.pl ($125,000 in 2002 dollars converted into $150,000 in 2009 dollars). While at the upper ranges, the jury's award is in line with other cases with similar evidence of emotional distress, particularly in light of the rank held by these Defendants within the police department and the nature and scope of the offensive conduct. *See, e.g., Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (approving award of $100,000 for emotional damages where the only evidence of harm was plaintiff's testimony and there was no evidence of medical treatment); *Patrolmen's Benevolent Ass'n et al. v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) ("Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, is not required."); *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739 (KMW), 2005 U.S. Dist. LEXIS 31578, at *46–47 (S.D.N.Y. Sept. 26, 2005) ("The range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000."); *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 308-309 (S.D.N.Y. 2001) (collecting cases awarding emotional distress damages in cases of false arrest and other police misconduct).

Defendants also argue that the jury's award should be reduced because "a significant part of Plaintiff's emotional distress was caused by circumstances for which he cannot recover," that is, the investigation of Plaintiff for insubordination and conduct unbecoming an officer, which the jury was instructed to disregard. (Defs.' Mem at 18.)[6] While the testimony on emotional

---

[6] Defendants also argue that the award should be reduced because Plaintiff should not be permitted to recover for emotional distress related to the failure to investigate "the purported deficiencies in the Police Department," because

distress does not tie specific retaliatory conduct to specific manifestations of Plaintiff's distress, the evidence does clearly show that Plaintiff was distressed over a long period of time, that the distress affected his lifestyle and personality, and that Defendants' egregious acts of retaliation was a principal source of his distress. Furthermore, the jury was instructed to disregard all evidence and testimony with respect to the Internal Affairs investigation, and was also reminded to only award damages that it found were "caused by the defendants' violation of plaintiff's First Amendment rights." (Trial Tr. 615.) "'[J]uries are presumed to follow their instructions.'" *See, e.g.*, *Creative Waste Mgmt., Inc. v. Capitol Entl. Servs., Inc.*, 495 F. Supp.2d 353, 361 (S.D.N.Y. 2007) (quoting *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (citation omitted)); *see also TradeCard, Inc. v. S1 Corp.*, 509 F. Supp.2d 304, 327 (S.D.N.Y. 2007) ("Courts are entitled to presume that the jury followed the instructions given to it.") (citing *Chalmers v. Mitchell*, 73 F.3d 1262, 1267 (2d Cir. 1996)). Defendants have offered no basis to rebut this presumption and allow the Court to conclude that the jury erred and awarded damages for emotional distress not resulting from Defendants' violations of Plaintiff's First Amendment rights. Thus, Defendants' argument provides no basis to set aside or reduce the jury's award.[7] *Cf. Ruhling*, 2008 U.S. Dist.

this act was not truly adverse. (Defs.' Mem. at 18.) As this argument was rejected on Defendants' Rule 50(b) motion, it is unnecessary to discuss it further as it relates to Plaintiff's award for emotional damages.

[7] Notably, a significantly higher award for emotional distress by the jury might have provided a reason to question this presumption, or might have led to an award that shocked the judicial conscience. *See, e.g.*, *Khan*, 2008 U.S. Dist. LEXIS 76721, at *23–29 (finding that the jury's award should be reduced because it encompassed damages for which plaintiff could not recover); *Ruhling*, 2008 U.S. Dist. LEXIS 38936, at *23–27 (reducing emotional distress award to account for the contribution of claims that were rejected by the jury to plaintiff's distress).

LEXIS 38936, at *19–20 (reaching a similar conclusion regarding the jury's decision to award emotional distress damages).

   B.   *The Punitive Damages Award Is Subject to Remittitur Reducing It to $100,000 as to Each Individual Defendant*

"Punitive damages are available in a § 1983 action 'when a defendant's conduct is shown to be motivated by an evil motive or intent or when it involved reckless or callous indifference to the federally protected rights of others.'" *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). The jury has wide discretion in granting an award of punitive damages. *Id.* Nevertheless, the court "may refuse to uphold a punitive damage award when the amount is 'so high as to shock the judicial conscience and constitute a denial of justice.'" *Id.* (quoting *Hughes v. Patrolmen's Benevolent Ass'n of New York Inc.*, 850 F.2d 876, 883 (2d Cir. 1988)). In determining whether a given award is excessive, the court must "keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'" *Id.* at 809 (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)). Thus the court should ensure "'that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" *Vasbinder*, 976 F.2d at 121. The Supreme Court has articulated three guideposts to be used in determining whether a punitive damages award is excessive: "(1) the degree of reprehensibility of the tortuous conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or

22

imposed in comparable cases." *Lee,* 101 F.3d at 809 (citing *BMW of N. Am. v. Gore,* 517 U.S. 559, 575 (1996)).

"The Supreme Court in *Gore* noted that reprehensibility is 'perhaps the most important" factor in assessing a punitive damage award.'" *Id.* (citing *Gore,* 517 U.S. at 575). Three "aggravating factors" identified by the Court that are "associated with particularly reprehensible conduct" include: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Id.* (citing *Gore,* 517 U.S. at 576). Here, there was substantial evidence to support the jury's conclusion that the Individual Defendants sought to suppress Plaintiff's speech on matters of public concern by systematically retaliating against him over a period of time. These actions were not done negligently, but with malice, involving, as the jury reasonably found, separate acts over time by each Individual Defendant. Furthermore, as Plaintiff points out, the retaliation at issue in this case was "made worse by the fact that the actors were the three highest members of the Suffolk County Police Department, sworn with the duty to protect the public and uphold the laws of this state and country." (Pl.'s Mem. (Doc. No.78) at 35.)

In considering the second *Gore* factor, the ratio of the punitive damage award to the actual harm inflicted, "the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred." *Gore,* 517 U.S. at 581. Here, the ratio between the

compensatory damages award (after remittitur) and the punitive damages award is approximately 4:1, a ratio found acceptable by the Supreme Court. *See Patterson*, 440 F.3d at 121 ("[T]he Supreme Court has upheld a punitive damage award of 'more than 4 times the amount of compensatory damages.'" (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24 (1991))).

The final *Gore* factor, the relationship between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases, also does not militate in favor of reducing the award. This factor demonstrates the Supreme Court's concern with according proper deference to "legislative judgments concerning appropriate sanctions for the conduct at issue." 517 U.S. at 583. "When penalties for comparable misconduct are much slighter than a punitive damages award, it may be said that the tortfeasor lacked 'fair notice' that the wrongful conduct could entail a substantial punitive award." *Lee*, 101 F.3d at 811 (citing *Gore*, 517 U.S. at 584). In this case the Individual Defendants, high-ranking Police Department officials, should have appreciated the gravity of retaliating against a subordinate for speaking out on matters of public concern, and should have understood that such conduct could have adverse economic consequences. *See id.*

In these circumstances, the Court does not hesitate to find that the jury properly awarded punitive damages against the Individual Defendants. However, the Court is not convinced that the punitive damages awarded against each Individual Defendant were "reasonable in their amount." *Vasbinder*, 976 F.2d at 121. The Second Circuit has said that courts evaluating the reasonableness of a damages award should consider not only the *Gore* factors, but should

compare the award at issue with those made in similar cases. *See Lee*, 101 F.3d at 812; *Ismail*, at 186. In doing so, the Court finds excessive as a matter of law the magnitude of the jury's punitive damages award.

Plaintiff cites to no cases upholding awards of such a size in similar First Amendment retaliation cases, while Defendants cite to a number of cases in which awards were reduced to $10,000 to $30,000. (*See* Defs.' Mem. at 36–37 (citing *Patterson*, 440 F.3d 104 (reducing punitive damages award of $20,000 to $10,000); *Vasbinder*, 976 F.2d 118 (reducing $150,000 awards to $20,000 and $30,000); *Stack v. Jaffee*, 306 F. Supp. 2d 137, 142 (D. Conn. 2003) (reducing $200,000 award to $25,000)).) Nevertheless, the Court's research reveals other cases in which higher awards were upheld for emotional distress suffered as a result of retaliation in the law enforcement context. *See, e.g.*, *Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876, 883 (2d Cir. 1988) (declining to disturb jury's punitive damage award of $175,000 as against an individual police officer found liable for intentional infliction of emotional distress against a fellow officer); *Moskowitz v. Coscette*, 3 Fed. App'x 1 (2d Cir. 2001) (upholding $75,000 against police chief for First Amendment retaliation); *Russo v. City of Hartford*, 419 F. Supp. 2d 134 (D. Conn. 2006) (same); *Schults v. Feldman*, No. 5:88-CV-449 (EBB), 1997 U.S. Dist. LEXIS 3428 (D. Conn. Feb. 18, 1997) (reducing punitive damages award in retaliatory failure to promote case from $300,000 to $150,000).

Defendants also argue that the punitive damages award should be reduced because the Court should consider the Individual Defendants' personal financial situations in determining

whether the award of punitive damages is excessive. (Defs.' Mem. at 37 (citing *Patterson*, 4404 F.3d 104).) While Defendants are correct that the Court will not affirm punitive damages awards that "result in the financial ruin of the defendant" or "constitute a disproportionately large percentage of the defendant's net worth," *Vasbinder*, 976 F.2d at 121, Defendants at trial failed to offer any evidence as to the Individual Defendants' personal financial situations. Such a record cannot be a basis for reducing the punitive damages award, and any fault for the incompleteness of the record lies with Defendants. *See Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 373–74 (2d Cir. 1988). Defendants could have offered such evidence at trial, or, if concerned about the potential prejudice of this type of evidence on liability, moved for bifurcation of the liability and damages phases of the trial. *Id.* They did neither. Nor did request any other procedure that would have preserved their ability to present timely evidence with respect to their financial condition. While Defendants, in their post-trial motions, have made a belated request for a hearing on this issue, they did not provide this Court with one shred of evidence, in the form of affidavits, documents or the like, to allow this Court to determine whether Defendants' financial circumstances might have any bearing on the issue of remittitur, or whether a hearing would even be necessary or helpful.[8]

---

[8] Defendants generally assert, without any support, that "two of the three individual Defendants [Abbott and Gallagher] may not be indemnified for punitive damages." Def. Br. Dated November 10, 2009 at pp. 22-23. While at times the Second Circuit has sustained higher punitive damage awards in arguably comparable cases, it has done so in circumstances where "the Defendants' financial circumstances were not at issue" or where "the defendant's municipal employer agreed to indemnify him." *Patterson,* 440 F.3d at 122 (citations omitted). Thus, any agreement to indemnify Robilotto could arguably support a *higher* award as to him. As to Abbott and Gallagher, Defendants cite no cases that suggest that *the lack* of an indemnification agreement constitutes grounds for *reducing* an award against an individual municipal employee. In any event, here, Defendants chose not to raise their financial

Nonetheless, keeping in mind that "an award should not be so large as to constitute 'a windfall to the individual litigant,'" *Vasbinder*, 976 F.2d at 121 (quoting *Aldrich v. Thomson McKinnon Sec., Inc.*, 756 F.2d 243, 249 (2d Cir. 1985)), and considering the purposes of the punitive damages award, the factors set forth in *Gore*, and, particularly, the awards in comparable cases, this Court finds that the punitive damages award should be reduced to $100,000 against each Individual Defendant. This amount is squarely within the range of comparable cases involving First Amendment retaliation in the law enforcement context. *See, e.g., cases cited at p. 19–20, supra.* Moreover, this amount is properly and reasonably below the range of punitive damage awards for Section 1983 violations that involve police brutality. *See, e.g., Ismail*, 899 F.2d at 186 (upholding $650,000 in compensatory damages and $150,000 in punitive damages to Plaintiff who suffered displaced vertebrae, a cracked rib and serious head trauma at the hands of a police officer); *O'Neill v. Krzeminski*, 839 F.2d 9, 10 (2d Cir. 1988) (upholding punitive damages of $185,000 on claims of excessive force and denial of medical attention).

This is not to say that this Court condones Defendants' conduct or trivializes the harm that they caused. Indeed, these Defendants, often acting in concert, unlawfully wielded their rank and their considerable authority to retaliate against a vulnerable subordinate who sought to exercise his First Amendment rights to speak out on significant matters of public concern that directly affected the lives and safety of police officers performing their duties, and the public at

circumstances until their post-trial motions, and as such, this Court does not consider issues of indemnification in reviewing the jury's punitive damage awards. *See Smith*, 861 F.2d at 373–74.

large. "It was surely within the jury's discretion to send a message to [Defendants] and others that such retaliation is intolerable." *Vasbinder,* 976 F.2d at 119 (citation omitted). An award of $100,000 against each Defendant is reasonable under these circumstances and sufficient as a matter of law to send that message, to punish these Defendants for abusing their public trust, to deter other police officials from doing the same, and to otherwise satisfy the purposes behind an award of punitive damages.

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment as a matter of law on Plaintiff's First Amendment retaliation claim pursuant to Federal Rule of Civil Procedure 50(b) is DENIED in its entirety. Defendants' motion, in the alternative, for a new trial limited to damages or a remittitur of the punitive damages awards pursuant to Federal Rule of Civil Procedure 59(a), however, is GRANTED. Because the punitive damages award is excessive, a new trial on damages will be ordered unless Plaintiff agrees no later than twenty (20) days from the date of this Memorandum and Order, in writing, filed electronically with the Court and served on Defendants, to accept a remittitur of the punitive damages awards to $100,000 per Individual Defendant.

SO ORDERED.

Dated: Brooklyn, New York
September 24, 2010

_____
ROSLYNN R. MAUSKOPF
United States District Judge