UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THOMAS C. WALLACE,

                    Plaintiff,

         - against -

SUFFOLK COUNTY POLICE DEPARTMENT,
COUNTY OF SUFFOLK, JOHN GALLAGHER,
PHILLIP ROBILOTTO, and JAMES ABBOTT,
Individually and in their Official Capacities,

                    Defendants.
-------------------------------------------------------------X

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON
BENCH TRIAL ON FINANCIAL
DAMAGES**
04-CV-2599 (RRM)(WDW)

**MAUSKOPF, United States District Judge.**

        Plaintiff Thomas C. Wallace seeks certain additional financial damages, to be determined

by bench trial, following a jury's verdict finding defendants liable for First Amendment

retaliation pursuant to 42 U.S.C. § 1983, and awarding emotional distress and punitive damages.

After considering the record on the bench trial, and for the reasons set forth below, the Court

finds that plaintiff is entitled to damages compensating him for the loss of one hundred and forty-

four accrued sick days for which he would otherwise have been compensated upon his

retirement, and that plaintiff is not entitled to the other additional financial damages he seeks.

## PROCEDURAL HISTORY

        Plaintiff brought this action under 42 U.S.C. § 1983 against the County of Suffolk

("County"), the Suffolk County Police Department ("SCPD"), former SCPD Commissioner John

Gallagher, former Chief of Department Phillip Robilotto, and former SCPD Deputy

Commissioner James Abbott (together, "defendants"), alleging violations of his First and

Fourteenth Amendment rights.  (*See* Compl. (Doc. No. 1).)

        In July 2009, the Court held a jury trial on plaintiff's First Amendment claim.  The jury

found that the three individual defendants, Gallagher, Abbott, and Robilotto, had each taken various adverse actions against plaintiff in retaliation for the exercise of his First Amendment free speech rights. The jury did not find the County liable. (Jury Special Verdict Form (Doc. No. 64.))[1]

Specifically, the jury found the individual defendants liable for the following adverse employment actions: (1) the premature submission of plaintiff's retirement papers (all individual defendants); (2) the omission of and/or failure to correct certain information in the retirement papers (Gallagher); (3) the failure to correct plaintiff's Injured Employee Report (Gallagher, Abbott); (4) the determination that plaintiff was fit for light duty (Robilotto); (5) the assignment of plaintiff to the First Precinct (Robilotto); (6) the failure to investigate plaintiff's complaints regarding training, equipment, staffing, supervision, morale, and/or other deficiencies in the Emergency Services Unit ("ESU") (all individual defendants); (7) the failure to prevent, stop, or redress the violation of plaintiff's First Amendment rights (Abbott); and (8) a pattern of harassment (Abbott). (*Id.*)

The jury awarded Plaintiff $200,000 in compensatory damages for emotional distress as to all defendants, and a total of $675,000 in punitive damages, or $225,000 each, against the three individual defendants. (*Id.*) On September 24, 2010, the Court denied defendants' post-trial motion for judgment as a matter of law, but found the punitive damages award excessive, ordering a new trial on damages unless plaintiff accepted a remittitur of the punitive damages award to $100,000 against each individual Defendant. (Doc. No. 83.) On October 13, 2010, plaintiff accepted the remittitur. (Doc. No. 84.)

Prior to trial, the parties stipulated that, once the issues of liability, emotional distress

---

[1] Claims against the SCPD were not submitted to the jury as it is not an entity subject to suit.

damages, and punitive damages were decided by the jury, the Court would determine in a bench

trial plaintiff's entitlement to several additional categories of financial damages. (Trial Tr.

("Tr.") at 53–54.) By stipulation (*see* Minute Entry of July 7, 2011 (Doc. No. 116)), the parties

agreed that no live testimony was required, and that the record for this bench trial consists of:

(1) the trial record, including all admissible testimony, exhibits and the jury's special verdict; (2)

all papers and exhibits submitted in connection with Plaintiff's Application for Financial

Damages ("Application") (Doc. Nos. 89, 91 and 92); and (3) supplemental letters and all exhibits

attached thereto further amplifying the evidence and arguments made in connection with

plaintiff's Application (Doc. Nos. 101, 102 and 110). At multiple status conferences, held in

person and by phone, all parties were given opportunities to orally address the issues raised by

the Application (*see* Minute Entries of May 19, 2011 (Doc. No. 100), June 9, 2011 (Doc. No.

107), and July 7, 2011 (Doc. No. 116).) It is these additional damages, on the record outlined

above, that the Court herein decides.

## **FINDINGS OF FACT**[2]

Plaintiff began working for the Suffolk County Police Department ("SCPD") as a police

officer in July 1986, and was transferred to the ESU in June 1997. (Tr. at 32, 35.) On March 11,

1998, plaintiff responded to an emergency involving a person who had barricaded himself on a

boat carrying propane gas tanks. (Tr. at 38.) After plaintiff boarded the boat, it exploded and he

sustained severe injuries. (Tr. at 39–40.) Plaintiff was hospitalized and underwent numerous

surgeries to treat his injuries. (Tr. at 40–42, 44.) As of the date of the accident, plaintiff was

placed on what is known in the SCPD as "401 injury leave status," during which plaintiff

performed no police duties while continuing to receive his full salary and benefits, pursuant to

---

[2] These findings of fact are solely those necessary to determine plaintiff's request for additional financial damages.

Municipal Law 207-c.  (Tr. at 135–36, 325.)

Between the summer of 1999 and early 2004, plaintiff spoke out on issues of public concern relating to the accident through a series of correspondence, conversations, and meetings with high-ranking members of the SCPD.  For example, in the summer of 1999, plaintiff met with then Deputy Commissioner Abbott and raised issues regarding training, supervision, equipment, morale, staffing, failure to adhere to rules and regulations, and other deficiencies that affected the performance and safety of the ESU.  (Tr. at 56–60.)  Plaintiff also discussed personal issues, such as difficulties he faced in attempting to correct his Injured Employee Report.  (Tr. at 56–57.)  The Injured Employee Report, filed by the SCPD after the boat explosion, did not contain some of the injuries plaintiff received during the explosion.  (Tr. at 44–45.)  When Abbott advised that there would be no investigation into any of plaintiff's allegations, adding that "nothing is going to be done to make the police department look bad," plaintiff told Abbott that the only recourse he would have was to go public and to Newsday.  (Tr. at 61.)  Abbott further advised "[t]here's people in this police department will not take kindly to any kind of effrontery," adding, "[y]ou'll do something now and you will lament it for a lifetime."  (*Id*.)  Plaintiff testified that during this meeting, Abbott promised, instead, to keep him on 401 injury leave until he was 62 years old, at which time he would retire.  (*Id*.)

About a year later, plaintiff communicated again with Abbott and raised many of the same concerns he had raised in the summer 1999 meeting.  (Tr. at 65–66, 210–11.)  Plaintiff also reiterated his demand for an investigation into the failings of the ESU.  (Tr. at 65–66.)  On August 20, 2001, plaintiff sent a letter to Gallagher, then Commissioner of the SCPD, in which he voiced these same concerns and expressed his frustration that no investigation had yet been conducted.  (Tr. at 69–71; Pl.'s Tr. Ex. 26.)

In October 2001, plaintiff met with Robilotto, then SCPD Chief of Department, to discuss the contents of plaintiff's August 20, 2001 letter to Commissioner Gallagher. (Tr. at 71–72, 172, 321–23, 344–49.) Plaintiff testified that Robilotto threatened him, insinuating that he should refrain from voicing his concerns, and offered to make him a detective – an offer that plaintiff rejected. (Tr. at 72–74.) At the meeting, plaintiff requested an official letter that "spelled out all of [his] injuries and that [he was] injured as a result of an attempted murder of a police officer, an assault" because the Injured Employee Report failed to specify that plaintiff's injuries were the result of an "assault" or "federal crime." (Tr. at 172–73; Pl.'s Tr. Ex. 13.) This omission, plaintiff testified, precluded him from eligibility for a federal award given to officers seriously injured in the line of duty. (Tr. at 172–73, 374.)[3]

On April 9, 2002, plaintiff sent a letter to Deputy Commissioner Abbot reiterating his complaints and concerns. (Tr. at 76–77; Pl.'s Tr. Ex. 27.) On March 11, 2003, plaintiff filed a complaint with the Public Integrity Bureau of the Suffolk County District Attorney's Office. (Tr. at 79–80.) In April 2003, plaintiff made a complaint to the SCPD Internal Affairs Bureau and demanded an investigation into the problems he identified with the ESU and the handling of the boat explosion. (Id.)

On December 4, 2002, the SCPD filed for plaintiff's retirement. (Tr. at 77–78, 154; Pl.'s Tr. Ex. 42.) Before December 2002, the SCPD instituted a policy that permitted a supervisor to involuntarily retire any police officer who had been on 401 injury leave for longer than a year.

---

[3] As discussed more fully below, the record contains almost no information about the specific nature and amount of the federal award. At trial, Sergeant Ward testified that he believed the federal award was a "monetary" or "cash" benefit, "in the neighborhood of a hundred thousand." (Tr. at 374.) The record contains no additional evidence describing the federal award in any detail.

(Tr. at 277–80.)[4]  Gallagher and Robilotto drafted eligibility criteria and selected forty-six officers, including plaintiff, for involuntary retirement.  (Tr. at 280–82, 293–96, 356–57.)  According to Robilotto, a chief criterion was the unlikelihood that the officer on 401 injury leave would return to work.  (Tr. at 357.)  Another factor considered was whether the officer had refused to return to work after being found fit for light duty.  (Tr. at 281–82.)

The forty-six officers selected for involuntary retirement had been on 401 injury leave for approximately three years to more than five years.  (Tr. at 354–55.)  By December 4, 2002, plaintiff had been on 401 injury leave for over four years.  (Tr. at 135–36, 325.)  At least some SCPD officers had been maintained on 401 injury leave for ten years or longer before retiring.  (Tr. at 353–55, 400.)  Robilotto testified that a police officer named Michael Milwort had been on 401 injury leave for ten years.  (Tr. at 353–54.)  Sergeant Ward testified that another officer, Kenny Tuthill, had been on 401 injury leave for "probably a twelve or thirteen year period," and that other unidentified officers were on 401 injury leave for over ten years.  (Tr. at 400.)

Plaintiff learned that the SCPD had filed for his retirement in January 2003.  (Tr. at 78; Pl.'s Tr. Ex. 40.)  In their initial application to retire plaintiff, the SCPD omitted certain information, including some of the injuries he had sustained during the boat explosion.  (Tr. at 171–72.)  On June 19, 2003, plaintiff filed his own application for retirement.  (Tr. at 79, 155–56; Defs.' Tr. Ex. H.)  Plaintiff retained an attorney to help him file his retirement papers, and his attorney told the state to disregard the County's application.  (Tr. at 155.)  The state then denied the retirement application that had been filed by the SCPD.  (Tr. at 172.)  The state ultimately approved the application that plaintiff submitted on his own behalf, and he retired on June 7, 2004.  (Tr. at 156, 396.)  Plaintiff's disability pension from the state amounts to approximately

---

[4] General Municipal Law § 207-c permits, but does not require, the police department to retire an officer who has been on 401 injury leave for longer than a year.  (Tr. at 351.)

three quarters of his former salary.  (Tr. at 157.)

Throughout the period plaintiff was on 401 injury leave status, plaintiff reported to the SCPD Medical Evaluation Unit ("MEU") for periodic examinations.  (Tr. at 88.)  Between March 1998 and September 2003, each evaluation recommended that plaintiff remain on 401 injury status.  (Defs.' Tr. Exs. B1–B8.)  On September 2, 2003, plaintiff hand delivered a letter to Commissioner Gallagher that reiterated his concerns.  (Tr. at 89; Pl.'s Tr. Ex. 28.)  On the same day, plaintiff was examined by a SCPD physician and, for the first time since the boat explosion, was found fit for light duty, allowing him to return to work, albeit in a limited duty capacity.  (Tr. at 89–90, 146.)  Plaintiff contested the finding that he was fit for light duty and opted for an independent medical examination by MEDSCOPE, pursuant to the police officers union's collective bargaining agreement.  (Tr. at 148, 384–85; Defs.' Tr. Ex. D.)  Because plaintiff opted for the MEDSCOPE examination, he was not immediately reinstated to active duty.  (Tr. at 384, 424.)

The MEDSCOPE physician found that plaintiff was fit for light duty, but he recommended extensive restrictions on the activities plaintiff could be expected to perform.  (Tr. at 392–93, 428–30; Defs.' Tr. Ex. E.)  On October 21, 2003, the police department reinstated plaintiff and assigned him to the First Precinct.  (Tr. at 91, 395; Pl.'s Tr. Ex. 21.)  Because of the physician's restrictions on plaintiff's ability to work (*e.g.*, that plaintiff sit and stand only for brief periods of time) and plaintiff's own concerns about exposure to "combative prisoners, people walk[ing] in from the street injured, people [being] assaulted in the lobby," plaintiff did not report to active duty in the First Precinct.  (Tr. at 91–92.)  Instead, plaintiff used one hundred and forty-four sick days to remain out of work from October 21, 2003 until he retired on June 7, 2004.  (Tr. at 407.)  When he retired, plaintiff was compensated for his remaining, unused sick

days.  (Tr. at 152.)

In December 2004, plaintiff filed a grievance through arbitration arguing that the County had violated the procedures required under collective bargaining agreement to find him fit for light duty.  On February 16, 2005, the arbitrator denied his grievance.

## CONCLUSIONS OF LAW

Plaintiffs must prove every element of a Section 1983 claim by a preponderance of the evidence, "including those elements relating to damages."  *Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir. 1993); *see also Public Adm'r of Queens Cnty. v. City of N.Y.*, No. 06-CV-7099 (LBS), 2010 U.S. Dist. LEXIS 118175, at *24 (S.D.N.Y. Nov. 2, 2010) (citing S. Nahmod, *Civil Rights & Civil Liberties Litigation: The Law of Section 1983* § 3.4 (4th ed. 1998)).[5]  The "basic purpose" of Section 1983 damages is "to compensate persons for injuries that are caused by the deprivation of constitutional rights."  *Carey v. Piphus*, 435 U.S. 247, 254 (1978).

"To recover compensatory damages under Section 1983, a plaintiff must prove that his injuries were proximately caused by the constitutional violation."  *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994) (citation omitted); *see also Sloup v. Loeffler*, 745 F. Supp. 2d 115, 143 (E.D.N.Y. 2010) (same) (citations omitted); *Tatum v. City of N.Y.*, 668 F. Supp. 2d 584, 598 (S.D.N.Y. 2009) (same) (citation omitted).  Section 1983 defendants are "'responsible for the natural consequences of [their] actions,'" and may "'be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.'"  *Kerman v. City of N.Y.*, 374 F.3d 93, 126 (2d Cir. 2004) (quoting *Warner v. Orange Cnty. Dep't of Probation*, 115 F.3d 1068, 1071 (2d Cir. 1997)).  However, a defendant "'whose initial act is the 'but for' cause of some ultimate harm (*i.e.*, the harm would not have happened but for the

---

[5] At a status conference held on June 9, 2011, the parties agreed that this standard applied.

initial act) is not legally liable for the harm if an intervening act is a 'superseding cause' that breaks the legal chain of proximate cause.'" *Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 351 n.7 (2d Cir. 2000)). One example of a superseding cause that breaks the chain of proximate cause is the "intervening exercise of independent judgment." *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (internal citation omitted) (in Section 1983 due process claim, court's refusal to suppress evidence was intervening exercise of independent judgment that broke chain of proximate cause between defendant police officer's unlawful search and seizure and plaintiff's injury).

"Damages in a section 1983 case are generally determined according to principles derived from the common law of torts." *BD v. DeBuono*, 193 F.R.D. 117, 139 (S.D.N.Y. 2000) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–06 (1986)); *see also Townes*, 176 F.3d at 148 (same). In New York, "[t]he damages recoverable in tort actions cannot be contingent, uncertain, or speculative; but if the fact is established that the plaintiff has sustained an actionable injury as the direct result of the defendant's wrongful act, reasonable certainty as to the amount of that injury is all that is required." 36 N.Y. Jur. 2d Damages § 17; *see also Fiederlein v. N.Y. City Health & Hosp. Corp.*, 56 N.Y.2d 573, 574 (1982) ("Mere conjecture, surmise or speculation is not enough to sustain a claim for damages."). However, "the rule which proscribes the recovery of uncertain and speculative damages applies where the fact of damages is uncertain, not where the amount is uncertain." *Toporoff Eng'rs, P.C. v. Fireman's Fund Ins. Co.*, 371 F.3d 105, 109 (2d Cir. 2004) (citations omitted); *see also* 36 N.Y. Jur. 2d Damages § 16 ("The uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to the amount of damage, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.").

Plaintiff now seeks compensation for three categories of economic loss specifically flowing from four adverse employment actions found by the jury. (Pl.'s Mem. Supp. Fin. Damages (Doc. No. 89) at 2.) First, plaintiff seeks damages for lost income, arguing that the SCPD's premature submission of his retirement papers resulted in the "unexpected financial loss of a quarter of his salary annually from approximately November 2002 until [plaintiff] reaches the age of sixty-two." (*Id*. at 8.) This sum represents the differential between the amount that plaintiff receives under the state's pension plan and his prior salary as a police office. Plaintiff claims he is entitled to this amount because, as plaintiff testified, Abbott promised to keep him on 401 injury leave until he reached the age of 62. Plaintiff argues alternatively that he is entitled to such lost income for a lesser period, for example, for ten years, relying on testimony at trial that certain other injured police officers were maintained on 401 injury leave for up to ten years.[6] (*Id.*) Second, plaintiff seeks payment for 144 sick days he used as a result of defendants' retaliatory actions. (*Id*. at 12.) Plaintiff asserts that defendants' (1) omissions of, and failure to correct, information in his retirement papers, and (2) determination that he was fit for light duty, proximately caused plaintiff to use accumulated sick days, for which he would otherwise have been compensated upon his retirement. (*Id*. at 9, 12.) Finally, plaintiff argues that defendants' failure to correct omissions in his Injured Employee Report precluded him from receiving a

---

[6] The Court notes that plaintiff seeks damages beginning in November 2002, when the SCPD involuntarily submitted his retirement application. (Pl.'s Mem. Supp. Fin. Damages at 8.) Plaintiff, however, did not experience a salary reduction in November 2002. Plaintiff's salary was not reduced to three quarters' pay until the state accepted his own retirement application on June 7, 2004. (Tr. at 157.) "[T]o collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than a mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury." *Miner*, 999 F.2d at 660 (internal quotation marks omitted). Thus, plaintiff cannot claim damages for any salary loss prior to June 7, 2004.

federal disability award.[7]  (*Id.* at 10–11.)  The Court now addresses each category in turn.

1.  Lost Income Flowing from Defendants' Premature Submission of Plaintiff's Retirement Papers

To recover damages for lost income, plaintiff must prove by a preponderance of the evidence that the causal connection between defendants' retaliatory action and his injury is "sufficiently direct."  *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998) (citations omitted).  Put another way, plaintiff must prove that the SCPD's premature submission of his retirement papers proximately caused him to retire.  *See Gibeau*, 18 F.3d at 110; *Miner*, 999 F.2d at 660.  There has been no such showing here.

Although the jury found that defendants retaliated against plaintiff by prematurely *submitting* his retirement papers on December 4, 2002, that application was ultimately denied by the state.  (Tr. at 77–78, 154, 172; Jury Special Verdict Form.)  As such, he suffered no diminution of salary as a direct result of this action.  After defendants submitted plaintiff's retirement application, plaintiff retained an attorney and, on June 19, 2003, he independently filed his own separate retirement application.  (Tr. at 155–56.)  Indeed, plaintiff's attorney "told the state to disregard the county's application," which defendants had submitted approximately seven months earlier.  (Tr. at 155.)  The state then denied the retirement application that had been submitted by defendants.  (Tr. at 172.)  Ultimately, the state approved plaintiff's own retirement application, and he retired on June 7, 2004.  (Tr. at 156.)  Thus, the Court finds that no direct

---

[7] Plaintiff's memorandum in support of his application for financial damages mentions in passing that defendants' failure to correct omissions of certain injuries in his Injured Employee Report also resulted in the denial of health insurance coverage for treatment of plaintiff's left knee injury.  (Pl.'s Mem. Supp. Fin. Damages at 10.)  Plaintiff's later submission to the Court, however, omitted any mention of this purported economic loss.  (*See* Pl.'s Letter of June 2, 2011 (Doc. No. 102).)  When confronted with this issue at a hearing on July 7, 2011 plaintiff withdrew this claim for damages.  (See Minute Entry of July 7, 2011 (Doc. No. 116).)

harm resulted from the SCPD's premature submission of plaintiff's retirement papers.[8]

Plaintiff could still demonstrate proximate causation were he able to show that his decision to file a separate retirement application was reasonably foreseeable. *See Higazy*, 505 F.3d at 177 ("Defendants . . . may be liable for consequences caused by reasonably foreseeable intervening forces."); *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 161 (S.D.N.Y. 2009) ("[A]n actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." (citation and internal quotation marks omitted)). To do so, plaintiff would need to show, for example, that defendants somehow deceived him or that defendants could reasonably foresee that their misconduct would cause plaintiff to file his own retirement application. *See Higazy*, 505 F.3d at 177 (despite intervening act, the "chain of causation need not be considered broken if [the defendant] deceived the subsequent decision maker, or could reasonably foresee that his misconduct [would] contribute to an independent decision . . . .")). Put another way, plaintiff has the burden to show that his decision to file his own application for retirement is a "natural consequence[]" of defendants' initial submission of his retirement application. *Id.* at 175 (citation and internal quotation marks omitted); *see also Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000) ("section 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions'" (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961))). Here, however, plaintiff has failed to meet that burden.

Plaintiff has provided no evidence or explanation for *why* he chose to file his own retirement application. The only evidence in the record on this point is plaintiff's testimony that

---

[8] As Judge Seybert held in her decision denying defendants' motion for summary judgment, "because the SCPD's retirement paperwork was rejected Plaintiff never experienced any material change in his employment circumstances due to the submission." *Wallace v. Suffolk Cnty. Police Dep't*, No. 04-CV-2599 (JS), 2007 U.S. Dist. LEXIS 98745, at *29 (E.D.N.Y. Feb. 5, 2007).

he found errors in the SCPD's application and that he subsequently retained an attorney and filed his own retirement application. (Tr. at 79, 155–56.) This evidence does not demonstrate that plaintiff's decision to file his own separate retirement application was a natural consequence of defendants' actions. Plaintiff did not demonstrate in any way that he was unable to correct errors in the defendants' application without filing his own. Nor is there any evidence in the record as to whether plaintiff's position (financial or otherwise) would have been affected had the SCPD's incorrect application been accepted as opposed to his own. In fact, the only explanation for plaintiff's decision to file for retirement was provided by his attorney, who argued in summation that plaintiff decided to file his own retirement application because defendants had failed to correct errors in the application they submitted and he "wanted them to be right." (Tr. at 562.) Of course, "[a] summation is not evidence." *United States v. Aggrey-Fynn*, No. 04-CR-1148 (RWS), 2006 U.S. Dist. LEXIS 6157, at *12 (S.D.N.Y. Feb. 16, 2006) (citation and internal quotation marks omitted).[9]

Having failed to put forth any evidence of his reasons for filing his own retirement application, plaintiff has not established by a preponderance of the evidence that his decision to retire was a natural and foreseeable consequence of defendants' actions, and not an independent,

---

[9] Even were the Court to consider this statement as evidence, plaintiff still would not have satisfied his burden of showing by a preponderance of the evidence that his decision to file a separate retirement application was a natural and foreseeable consequence of defendants' premature submission of his retirement application. The Court would still be forced to speculate about why he "wanted" the retirement application "to be right" -- for example., whether it would have impacted him financially -- and whether there was another way to challenge defendants' paperwork directly. Such impermissible speculation is fatal to plaintiff's claim.

superseding cause of his own retirement.[10]  *See Townes*, 176 F.3d at 147; *Stagl v. Delta Airlines*, 52 F.3d 463, 473 (2d Cir. 1995) (citation and internal quotation marks omitted); *Jeffries v. Harleston*, 52 F.3d 9, 14 (2d Cir. 1995) (reversing judgment for professor in First Amendment retaliation case because superseding cause broke the causal chain between the defendants' retaliatory acts and the plaintiff's injury); *Caraballo v. United States*, 830 F.2d 19, 22 (2d Cir. 1987) ("where the plaintiff's intervening actions are not a normal and foreseeable consequence of the defendant's conduct, the plaintiff's conduct becomes a superseding cause which absolves the defendant of liability"); *Barmapov v. Barry*, No. 09-CV-3390 (RRM), 2011 U.S. Dist. LEXIS 768, at*18 (E.D.N.Y. Jan. 3, 2011) ("Plaintiff's decision to plead guilty constitutes an independent, superseding cause of his conviction and incarceration."); *Martinez v. City of New York*, No. 06-CV-5671 (WHP), 2008 U.S. Dist. LEXIS 49203, at *11–12 (S.D.N.Y. June 27, 2008) (arresting officer not responsible for detainment possibly amounting to due process violation because judge's independent decision broke chain of proximate cause).

Accordingly, the Court finds that plaintiff has failed to show that SCPD's premature submission of his retirement application proximately caused him economic damages in the form

---

[10] The Court notes that plaintiff has also failed to present sufficient evidence to show that his decision to submit his own retirement papers was involuntary or coerced.  "Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (citation and internal quotation marks omitted).  Plaintiff did not (1) plead constructive discharge in his complaint, (2) argue constructive discharge in previous submissions to the Court, (3) present evidence of constructive discharge to the jury, or (4) ask the jury to consider whether he had been constructively discharged.  Indeed, as discussed above, plaintiff has not even explained why he filed a separate retirement application, much less proven that he was forced to do so.  Thus, plaintiff has failed to show by a preponderance of the evidence that he was "forced into an involuntary resignation." *Id.*; *see also Less v. Nestle Co.*, 705 F. Supp. 110, 113–14 (W.D.N.Y. 1988) (plaintiff in ADEA case precluded from claiming damages for lost income when facts were insufficient to demonstrate his choice to accept early retirement option was truly involuntary).

of lost wages.[11]

   2. <u>Compensation for Lost Sick Days</u>

   Plaintiff also seeks compensation for the loss of accrued sick days on two grounds: defendants' omission in and/or failure to correct information in plaintiff's retirement papers and, alternatively, the determination that plaintiff was fit for light duty. (*See* Pl.'s Mem. Supp. Fin. Damages at 9, 11–12.) The Court finds plaintiff is entitled to recover such damages on both grounds.

   *a. Omissions In and Failure to Correct Plaintiff's Retirement Application*

   As noted above, on December 4, 2002, the SCPD filed plaintiff's retirement application. (Tr. at 77–78, 154; Pl.'s Tr. Ex. 42.) On June 19, 2003, plaintiff filed his own separate retirement application and told the County to disregard the SCPD's application. (Tr. at 155.) On October 21, 2003, while both retirement applications were pending, plaintiff was reinstated to light duty. (Tr. at 396; Pl.'s Tr. Ex. 21.) However, because of the restrictions placed on him as well as his own concerns about returning to duty, plaintiff used accumulated sick days to remain out of work until the effective date of his retirement on June 7, 2004. (Tr. at 407.)

   As the record makes clear, it took the state approximately eleven to twelve months to approve plaintiff's own application. (Tr. at 156.) Based on this measure, the Court reasonably concludes that the approval process for an error-free SCPD application would have taken no longer than the process for approving plaintiff's own error-free application. Therefore, had

---

[11] This is not to say that defendants are not liable at all for damages related to the retaliatory act of prematurely submitting plaintiff's retirement application. "In an action brought pursuant to Section 1983, even when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right." *Gibeau*, 18 F.3d at 110 (citation and internal quotation marks omitted). It is not necessary to award nominal damages here, however, because the jury awarded $200,000 in emotional damages to compensate plaintiff for the emotional harm he suffered from this and other retaliatory actions taken by the defendants.

defendants submitted an error-free retirement application on December 4, 2002, or corrected it promptly thereafter, plaintiff likely would have retired on or before October 21, 2003, the date on which he was found fit for light duty. If plaintiff had retired before he was found fit for light duty, he would have been compensated for all the sick days he had accrued up to that point.[12] While it is impossible to know with mathematical certainty whether the state would have approved the SCPD's omission-free retirement papers by October 21, 2003, "the rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only that the loss or damage be capable of ascertainment with reasonable certainty." *Sloup*, 745 F. Supp. 2d at 137 (citation and internal quotation marks omitted). Here, plaintiff has established with reasonable certainty that, had defendants not omitted information from his initial retirement application, plaintiff would have been paid out for the full measure of sick days to which he was entitled on October 21, 2003.[13]

### b. Determination that Plaintiff was Fit for Light Duty

The Court also finds that plaintiff is entitled to compensation for these sick days on the alternative ground that such damages were proximately caused by defendants' retaliatory determination that he was fit for light duty. Of course, had this determination not been made, plaintiff would not have used any of these sick days. However, defendants contend that plaintiff is collaterally estopped from claiming financial damages for these sick days because he has already litigated and lost in arbitration this very issue. (Defs.' Letter of May 26, 2011 (Doc. No.

---

[12] In her decision on summary judgment, Judge Seybert noted the failure to include certain information "precluded Plaintiff from obtaining his retirement benefits in a timely manner and required Plaintiff to use 142 of his own accumulated sick days . . . . Arguably, had Plaintiff's retirement papers been correct, they would have been approved initially" and he would have been paid for his "unused sick days upon his retirement." *Wallace*, 2007 U.S. Dist. LEXIS 98745, at *30.

[13] The parties agreed to work collaboratively to calculate, based on the collective bargaining agreement and the SCPD compensation system, the specific amount due to plaintiff in the event that the Court awarded such damages.

101) at 4.)  Under federal law, the doctrine of collateral estoppel precludes a party from relitigating an issue when:  "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."  *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir. 1998) (citations and internal quotation marks omitted).  Applying this standard, the Court finds the doctrine of collateral estoppel inapplicable to plaintiff's claim of First Amendment retaliation.

First, the Court finds that the issues litigated in the arbitration proceeding are not identical to the issue in plaintiff's Section 1983 action.  In the arbitration proceeding, the issue was whether the County had violated the terms of the collective bargaining agreement by requiring plaintiff to be examined by MEDSCOPE.  (Arbitration Decision at 2.)  In contrast, the issue here is whether the determination that plaintiff was fit for light duty constituted an act of First Amendment retaliation that caused plaintiff to use accrued sick days.  (Tr. at 160.)  These issues are not identical, and the rights vindicated in the arbitration and those at issue here are fundamentally different.  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49–50 (1974). The issue at arbitration involved the interpretation of a contractual right – namely, the County's right under the collective bargaining agreement to require plaintiff to submit to an independent medical examination by MEDSCOPE.  Here, plaintiff's damages claim for lost sick days arises from his constitutional right to be free from retaliation for exercising his First Amendment rights. The County's right to enforce the collective bargaining agreement has no bearing on whether defendants' retaliatory act proximately caused plaintiff economic loss.  Second, it was not necessary for the arbitrator to decide that plaintiff was properly found fit for light duty.  In order

to resolve the dispute at arbitration, the arbitrator needed only to determine whether the County violated the terms of the collective bargaining agreement by requiring plaintiff to be examined by MEDSCOPE.

Finally, the record belies the notion that plaintiff had a full and fair opportunity to litigate his claims. The arbitrator's opinion is laced with allusions to plaintiff's "conspiracy" theories regarding the SCPD's efforts to retaliate against him for "his unrelenting struggle to right several wrongs he maintains were done to him." (Arbitration Decision at 10.) Such dismissive remarks concerning plaintiff's allegations of retaliation seriously call into question whether plaintiff had a full and fair opportunity to litigate factual issues pertaining to his Section 1983 claim in the arbitration proceeding.

Even assuming that plaintiff had a full and fair opportunity to litigate the very same issues as central to his grievance, the Supreme Court has counseled that federal courts "should not afford res judicata or collateral estoppel effect to an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." *McDonald v. City of West Branch*, 466 U.S. 284, 292 (1984); *see also Fayer v. Town of Middlebury*, 258 F.3d 117, 121 (2d Cir. 2001) ("[T]he Supreme Court ruled . . . that the determinations of labor arbitrators pursuant to collective bargaining agreements do not preclude subsequent federal actions to vindicate

certain federal statutory and constitutional rights." (citing *McDonald*, 466 U.S. 284)).[14]  In *McDonald*, the Supreme Court refused to accord preclusive effect to an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement in the context of a Section 1983 claim for First Amendment retaliation.  466 U.S. at 292; *see also Rolon v. Ward*, No. 05-CV-168 (WCC), 2008 U.S. Dist. LEXIS 86781, at *60 (S.D.N.Y. Oct. 24, 2008) (same); *Henneberger v. Cnty. of Nassau*, 465 F. Supp. 2d 176, 189 (E.D.N.Y. 2006) (same) (collecting cases).  As the Court explained, "although arbitration is well suited to resolving contractual disputes, . . . it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard."  466 U.S. at 290.

In arriving at this conclusion, the Court noted important differences between the two proceedings:  (1) arbitrators lack "the expertise required to resolve the complex legal questions that arise in § 1983 actions"; (2) "an arbitrator's authority derives solely from the contract . . . [and thus] an arbitrator may not have the authority to enforce § 1983"; (3) the interests of the union, which usually "has exclusive control over the manner and extent to which . . . [a]

---

[14] Although aspects of the *McDonald* decision have been called into question by subsequent cases, the Second Circuit expressly has not decided whether, in light of these newer Supreme Court decisions, district courts should now afford arbitration decisions preclusive effect.  *See Burkybile v. Bd. of Educ.*, 411 F.3d 306, 310 (2d Cir. 2005) ("we need not decide here whether arbitrations have preclusive effect").  As a result, district courts continue to follow *McDonald* when faced with requests to give preclusive effect to awards in arbitration proceedings brought pursuant to the terms of collective-bargaining agreements in the context of Section 1983 First Amendment retaliation cases.  *See, e.g.*, *Giglio v. Derman*, 560 F. Supp. 2d 163, 173 (D. Conn. 2008) ("the Court denies the Plaintiff's invitations to impose the doctrine of collateral estoppel and to adopt the facts found by the Arbitration Award"); *Henneberger*, 465 F. Supp. 2d at 190 ("[B]ecause the instant action closely mirrors the facts of *McDonald* itself – involving a public employee's post-arbitration claim under Section 1983 for First Amendment retaliation – that holding controls the preclusive effect to be accorded the Arbitrator's decision in this case.").  An arbitral decision, however, may be admitted as evidence in a Section 1983 action, and accorded such weight as the court deems appropriate with regard to the facts and circumstances of each case.  *See McDonald*, 466 U.S. at 292 n.13 ("We adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case." (citations and internal quotation marks omitted)); *see also Henneberger*, 465 F. Supp. 2d at 190 (same); *Bollenbach v. Board of Education*, 659 F. Supp. 1450, 1470 (S.D.N.Y. 1987) ("The Supreme Court specifically adopted no standards as to the weight to be accorded an arbitral decision, leaving it to the discretion of district courts.").

grievance is presented," are not always "identical or even compatible" with those of an

employee; and (4) "arbitral factfinding is generally not equivalent to judicial factfinding." 466

U.S. at 290–91. These considerations are equally compelling here. For example, the arbitrator's

decision at issue here in no way focused on the complexities of unconstitutional retaliation.

Instead, it focused on narrow issues relating to the propriety of procedural steps undertaken

pursuant to the collective bargaining agreement that, traditionally, fall within the core authority

and expertise of labor arbitrators. Moreover, the arbitrator rejected – indeed ridiculed – the very

same evidence and arguments that the trial jury here found by a preponderance of the evidence

gave rise to a First Amendment violation. (Arbitration Decision at 10 (stating that to believe

plaintiff's allegations, one had to accept the (presumably unbelievable) premise that police

officers "were all in cahoots" and agreed amongst themselves, "Let's get this guy, we'll show

him, put him back to work.") (quotations in original).) The Court finds that the arbitrator's

decision here, when viewed against the backdrop of *McDonald*, should not be accorded

preclusive effect, or, for that matter, given even minimal weight.[15]

For all of these reasons, "the Court denies [defendants'] invitations to impose the doctrine

of collateral estoppel and to adopt the facts found by the [a]rbitrat[or]." *Giglio*, 560 F. Supp. 2d

at 173. Accordingly, the Court finds that defendants' retaliatory determination that plaintiff was

fit for light duty proximately caused him to use one hundred and forty-four sick days, and

plaintiff is entitled to damages for the amount he would have received as compensation for these

sick days had they been part of his sick leave accruals at the time he retired.

---

[15] In fact, Judge Seybert, too, relied on *McDonald* in rejecting defendants' preclusion arguments on summary judgment. *See Wallace v. Suffolk Cnty. Police Dep't*, No. 04-CV-2599 (JS), 2007 U.S. Dist. LEXIS 98745, at *32 n.6 (E.D.N.Y. Feb. 5, 2007) ("The Court notes, however, that in *McDonald v. City of West Branch*, the Supreme Court held that when considering a Section 1983 First Amendment retaliation claim, federal courts should not afford preclusive effect to an arbitration proceeding pursuant to the terms of a collective bargaining agreement.").

3. Federal Disability Award

Plaintiff claims that defendants' failure to correct the Injured Employee Report, specifically the omission that his injuries were the result of an assault, precluded him from being eligible for a federal disability award. (Tr. 172–73, 374.) Plaintiff's claim to this federal award, however, is entirely speculative.

The law proscribing recovery of uncertain and speculative damages is well-settled in New York. *See Toporoff Eng'rs*, 371 F.3d at 109; *Mandal v. City of New York*, No. 02-CV-1367 (WHP), 2007 U.S. Dist. LEXIS 83642, at *8 (S.D.N.Y. Nov. 13, 2007) (applying doctrine to Section 1983 claim). It is therefore plaintiff's burden to prove by a preponderance of the evidence that he suffered economic losses with specific and clear documentation or expert testimony. *See Sloup*, 745 F. Supp. 2d at 138. Here, plaintiff has failed to produce sufficient evidence to establish that he would have received the federal disability award with reasonable certainty. Thus, any damages compensating him for the loss of the federal award would be "merely speculative or contingent." *Dockery v. Tucker*, No. 97-CV-3584 (ARR), 2006 U.S. Dist. LEXIS 97826, at *103 (E.D.N.Y. Sept 6, 2006) ("plaintiff must prove damages with sufficient certainty, such that damages are not merely speculative or contingent . . . [and] [a]s part of this burden, a plaintiff must also provide a reasonable means of and basis for calculating damages" (citations and internal quotation marks omitted)).

There is virtually no evidence in the record concerning this federal award. The only witness who described the award in any detail was Sergeant Ward, who believed it was a "monetary" or "cash" benefit, "in the neighborhood of a hundred thousand." (Tr. at 374.) Plaintiff has presented no evidence about the specific statute, regulation or other authority governing such an award. Nor has he presented evidence of the criteria for eligibility beyond the

vague assertion that the police officer's injuries must result from an "assault" or "federal crime." (Tr. at 172–73; Pl.'s Tr. Ex. 13.)  Thus, there is no evidence from which the Court can determine what federal award is at issue, or whether plaintiff would have met any or all eligibility requirements for any such award had plaintiff's Injured Employee Report been completed properly.  There is also no evidence in the record regarding the application or approval process for the award, and it is impossible to ascertain with any degree of certainty whether any applicant who does, in fact, meet all the eligibility criteria will automatically receive such an award. Finally, there is nothing in the record to indicate how much plaintiff could have or would have received, other than Sergeant Ward's loose estimate.  Accordingly, plaintiff has entirely failed to meet his burden of proving by a preponderance of the evidence that he in fact suffered any such loss.  As such, any damage award with regard to any federal benefit would be wholly speculative and inappropriate.  *See Toporoff Eng'rs*, 371 F.3d at 109.

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiff is entitled to damages compensating him for one hundred and forty-four accrued sick days for which he would otherwise have been compensated upon his retirement.  As stipulated, the parties shall confer to calculate the precise monetary amount of this damages award.  The Court further finds that plaintiff is not entitled to damages for any measure of lost income up to age 62 or for any lesser period, or to damages in connection with any federal award.

SO ORDERED.

Dated: Brooklyn, New York
     August 15, 2011

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge